Good morning. Our first case for today is case number 415-0502. For the appellant, we have Mr. Baker, and for the appellee, Mr. O'Hara, and this is Williamson v. Board of Trustees Police Pension Fund. Good morning. My name is James Baker. I'm appearing this morning on behalf of Daryl Williamson. In this case, Mr. Williamson is appealing under the Administrative Review Law, a decision of the Springfield Police Pension Board. At the time he filed his petition in May of 2011, Mr. Williamson had been a 23-year veteran of the Springfield Police Department. During the course of his employment, he had advanced to the rank of commander and deputy chief, had had no outstanding serious disciplinary problems, and had received a number of commendations. The issue in this case is whether the decision of the pension board's fact findings is contrary to the manifest weight of the evidence. And I am mindful, as pointed out in our briefs, that this is a deferential standard of review. And under that standard of review, the decision is entitled to stand unless an opposite conclusion is clearly evident. I think there are two points that have to be mentioned at the outset concerning that standard of review. The first is the review is based not upon selected portions of the record, under the Administrative Review Law, under the entire record. Secondly, as the Supreme Court stated in the Wade case, while it's a deferential standard of review, the deference afforded to an agency is not boundless. I'd like to begin my presentation by going to the heart of the decision of the pension board denying Mr. Williamson a disability benefit. And it appears in paragraphs 51 and 53 of the board's decision. Essentially, it concluded that he malingered and faked symptoms of PTSD, depression, and anxiety disorder. And he did it because he was facing termination and self-reported his symptoms to both his treating physicians and his evaluators. Essentially, what the board is doing is developing a syllogism, which goes something like this. We don't believe Williamson. We think he's not credible. The evaluators' decisions were based upon what Williamson told them. He self-reported. And therefore, since we don't think he's credible, the opinion of the evaluators, which is based upon what Williamson told, holds no weight. Now, in this case, I want to make sure I have my count correct. Seven psychiatrists either treated or evaluated Mr. Williamson. Three at the request or at the instance of the pension board. Two psychologists evaluated or treated him. A psychiatric clinical nurse practitioner treated him. And a social worker treated him. None. None ever suggested that Mr. Williamson was malingering or faking symptoms. All the evaluators of the board concluded that he did have post-traumatic stress disorder. Now, the board's hypothesis is based upon the notion that at the time Mr. Williamson filed his application for disability benefits, he was about to be terminated from his employment with the police department. Number one, that's incorrect. He had no outstanding discipline at that time. And while he was disciplined later, in July of 2011, it amounted to a three-day suspension. There never was, proximate to the time he filed his application, any suggestion that he was facing serious discipline. Number two, isn't a three-day suspension serious discipline? And if he's facing disciplinary action for something, then he has to guess what the consequences will be, wouldn't he? Well, I think under the civil service rules of the city of Springfield, it applies the policy of progressive discipline. And it's one thing to be given a three-day suspension, it's quite another to be terminated. And Mr. Williamson's work record throughout his history at the department did not have any type of prior discipline which would lead to the conclusion that termination was likely. Counsel, refresh my memory, when did the incident occur where he was taking the firing test, or that's probably not the proper name for it, but the gun test and he had problems with that and they sent him home. Wasn't that around the time that he applied? It was in April of 2011, I believe. And he applied May 9th? He applied on May 9th, but, and there's an important but here, Mr. Williamson had been treated for his psychiatric disorder going back to May of 2010. This just didn't all come about in the spring of 2011 when he applied for benefits. But prior to his application, had he been diagnosed with post-traumatic stress disorder by a doctor? By a doctor? Right, that's my question. No. I think that's important. By a clinical nurse practitioner who worked for a doctor, yes. The doctor that had treated him, Dr. Tabatabai, had diagnosed him to have, as I recall, anxiety disorder or a stress problem. But it's not clear in the record one way or another whether the post-traumatic stress disorder diagnosis had been made by Dr. Tabatabai at the time he applied for the benefit. Now the board held that he was not disabled within the meaning of the Illinois Pension Code. And basically that was based on the fact that the one doctor said that while he did suffer from these ailments, they did not prevent him from functioning as a police officer. Isn't that really where we have the divergence of the opinions? Well, if the board's decision had been, yes, he has a disability, but Dr. Finkenbein said it would not render him unfit to police service, that would be a pretty clear position to make. We would still disagree with it, but it would be clearly stated. So what are you saying the board held? Well, I can only go by what the board said in its opinion. And basically it credited a part of Dr. Finkenbein's position. Didn't go into why it credited, but just said it credited. But then if you read paragraphs 51 and 53, which appears back toward the end of the decision, and I'll read it. Paragraph 51 says, Darryl Williamson malingered or faked the symptoms of PTSD, depression, and anxiety disorder. Facing termination from work, Darryl Williamson self-reported to the examining doctors his alleged symptoms of PTSD, depression, and anxiety disorder. Then it goes on to say, Darryl Williamson, a seasoned homicide investigator, instigated an elaborate scheme to attain disability benefits by claiming PTSD, depression, and anxiety disorder. But in fact, he simply had an alcohol problem causing problems at work. Being on the verge of employment termination, he chose to pre-apply for pension disability benefits. Now, two points there. He wasn't on the verge of being terminated when he applied for the benefits in May of 2011. Number two, this wasn't like he woke up the morning he filed his disability benefits and said, aha, I'm going to go down and make a claim. Well, counsel, I need to stop you and back up just a moment. If you look at paragraph five where it says decision, the board's decision, don't they specifically state that he is not disabled within the meaning of the code, and also that he does not have a mental disability that would prevent him from performing as a police officer? It does say that. Yes. And I was going to address this in a moment, but let me go to it. Mr. Williamson was evaluated by four psychiatrists who either filed opinions or gave testimony for both in this case. Three of them concluded that he was disabled from police work. The one who did not was Dr. Finkenbein. And it's important to understand what Dr. Finkenbein said. And if you go to, I think I can find it here. I don't have the page number, but his opinion is in the abstract we filed. He basically said three things. The first thing he said was that if he went back to work, it would worsen his anxiety symptoms. And then he said, having said that, he'd worked for 15 years or 10 years or however long it was, having these symptoms, and he had done quite well. Well, the record reflects he had not done quite well. He had had some significant absenteeism going back to the year 2002. He had made multiple efforts, I think seven between 1996 and 2001, to get out of the major case squad. And while he was able to do his job, it was coming at a price. Moreover, I think Dr. Finkenbein took no issue with this, the symptoms kind of become cumulative. The more exposure or distress, the worse the symptoms get. Let me ask you this. We have also working within this situation an alcohol problem. Correct. And there was information that some of the symptoms being complained of could also be attributed to alcoholism. And then I think he's also diabetic, if I'm recalling correctly. And so how does that play in? I mean, it seems to me that Dr. Finkenbein thought it was important that he was addressing those other issues, therefore improving his ability to function and reducing his symptoms. Well, that's correct. And I can't recall if Dr. Finkenbein went into this, and I don't want to misrepresent the record. But I know Dr. Killian did, and I think one or two of the other evaluators did as well. He said it's kind of like a chicken and egg scenario. What comes first, the PTSD or the alcoholism? And I believe it was Finkenbein who said alcohol can be a crutch, and you can have a predisposition to alcohol, but the exposure to stress can exacerbate the problem. So I don't think it's possible, based upon this record, to separate the alcoholism from the stress disorder. It seems to me they went together. Now the board also specifically found that Mr. Williamson was not credible. And we had information regarding his failure to avoid driving over or through areas that would cause stress, and his involvement with victims and their families and TV shows. And so I guess my question is, is there a basis for this credibility determination that the board made? I don't believe there is. And we spoke at some detail in our opening brief and our reply brief about what the board claimed and what the evidence really was. And the board took little bits and pieces of evidence, but ignored much of the rest of the record which explained those things. You know, a simple example. It is true that each day he drove over the Spalding Dam where he had investigated a gruesome murder scene from his house. True, that's a fact. But what the board did not say is there were two routes he could go. The other route he would have been exposed to a homicide that he was involved in. He was accused of not reporting his problems to his father, his brother, and his partner. And what he said is, and I don't think there was any evidence in the record to discredit it, was, I'm a cop. My father was a cop. My brother's a cop. My friends are cops. There was a real stigma in the police department. And he cited two specific individuals who had had psychiatric disorders. And he said, I didn't want to be one of them. I wanted to hide it. And there was no evidence in the record that refuted that. How long did this hearing take? It was conducted in front of this board? How many hours of testimony was presented? It was at least two full days. And it may have been part of another day. How long did Mr. Williamson testify? Good question. At least four hours. And I suspect that's on the shy side. There were three witnesses that testified. Dr. Killian, Mrs. Williamson, and Mr. Williamson. Well, one of the things, you spoke earlier about deferential review. We're all in the appellate court here. But cumulatively, I think, I'm not sure what the figure is, but I think it must be close to 40 years' worth of trial court experience represented by the three of us. And one of the things that I'm most deferential to is credibility determinations by the trier of fact. It seems to me that the board here listened to all these people, and the credibility of your client is maybe the key issue. And they essentially said, we don't believe him. We think he's lying. How are we supposed to, on this record, conclude that that determination was wrong? Well, a couple of things. The first is, this hearing is prescribed by the pension code, and the pension code, by its language, makes this a medically-based inquiry. No benefit can be paid until at least three physicians examine the claimant. They don't all have to agree, but they'll have to examine him. So three did. They all concluded that he did have PTSD. Now, you know, the four physicians that examined him were all experienced forensic psychiatrists. We know what Williamson told Dr. Killian because Dr. Killian testified at length to that. We don't know, and there's nothing in the record about what he told the others other than brief information in the report. One would have to think that a forensic psychiatrist involved in making a PTSD diagnosis or assessment in determining disability would certainly make an inquiry concerning believability. And here's the and. Dr. Killian testified that because Mr. Williamson was claiming a disability benefit and thus had a bias in favor of perhaps exaggerating his medical condition, that he was obliged to really get into the gist of whether Williamson was credible. The board mentioned in paragraph 52, as stated by Dr. Killian, psychiatrists are not much better than random chance at identifying and truthfulness. Is that a fair characterization of his testimony? No. He did say that. He did say that, but then he went on and gave a detailed explanation about why he believed that Mr. Williamson was not faking his symptoms. Well, in other words, this is a fair characterization, but he then went on to explain why he didn't think it applied in this case? I would think so. But isn't there some indication that after Dr. Killian asked your client about whether or not he was familiar with the symptoms of PTSD, your client indicated no, even though he had been exposed to multiple types of information regarding the disorder? He hadn't been exposed to multiple types of information. Had he received some information from the veterans? I can't remember exactly what it was. According to Mr. Martin's report, he gave Mr. Williamson a test, and I don't recall the name of the test, and there was a scoring key in the test. That's as much as the information he had about PTSD. The information that was provided, according to Mr. Martin, was information dealing with stress reduction techniques, not the symptoms of PTSD. No other physician. In fact, this is a point. The board was critical of both Dr. Sarma and Dr. Jekyll because they did not speak to the criteria for PTSD. Counsel, you're out of time, but if you want to wrap up your thought there, that's fine. Just one thought. When in doubt, sometimes go to the law and take a look at what other courts have done. We made a detailed analysis. We tried to cite it, hopefully accurately, in our brief. But we found no court that ever affirmed the decision of a pension board saying a person did not have symptoms or did not have the condition when it found no support in the evaluators. And that's the case here. There's no medical evidence which supports the board's decision. Thank you, counsel. You'll have more time on rebuttal. Thank you. Mr. O'Hara. May it please the court, counsel, I want to indicate at the outset that I'm suffering from a severe upper respiratory infection, and I've been taking some high-powered drugs for it, prescribed, and so I might even be more inarticulate than I have in the past. Please forgive me. I hope to prevail in this argument, but I will consider it a minor victory in addition if I get through it without a coughing fit. At the outset, I want to indicate that I was not present at the time of the administrative hearing. I was hired for the review aspects of it. I don't know if the board considered this a close case, but I don't think it's a close case. It could have been, but I don't think it's a close case on review, primarily because of the deferential and, I think, daunting standard of review, and I think it's important to look at that standard of review and ask ourselves what the appellant is asking this court, to somehow carve out a new kind of standard of review. I believe that the appellant is asking this reviewing court, as it did the circuit court, to make independent factual determinations from conflicting testimony. I can acknowledge that someone reading certain parts of this record may be able to draw different conclusions, but the test here, for example, in the Coyne decision, is that a reviewing court is not allowed to make independent factual determinations. The administrative board is to have the benefit of the doubt. Now, in my memorandum to the circuit court and also with regard to my brief, I painstakingly went through the record with respect to the decision, the 18-page decision of the board, and indicated in each factual determination by the board where that fact was derived in the record. So there is certainly confident evidence. Now, Mr. Baker indicates that this was selective by the board. There's no evidence whatsoever that this board did not consider all the evidence in deriving its decision. There's no evidence. There's not a scintilla of evidence to that effect. There is an indication, obviously, that the board made its decision from specific aspects of the record after distilling what they heard in three days of testimony. It wasn't two days of testimony. It was three days of testimony, over which two of those days the claimant testified. And I think that's an important point here. We're not talking about broken limb here. We're not talking about some sort of objective symptomatology. Dr. Killian, a psychiatrist that the claimant hired to testify, indicated that with the PTSD, the symptoms are in large part subjective. And the question then is, what are we asking for? What is the claimant asking for? Is that somehow this court carved out a rule that says that if a person gives subjective symptoms to treating or evaluating physicians, that an administrative review board is not allowed thereafter to question the credibility of that condition of subjective symptoms to the treating physician. Let me ask you that, counsel. This is, as I mentioned to Mr. Baker, this court gets a lot of administrative review matters, and we get a lot of matters from trial court as well, where triers of fact, judges when appropriate, or administrative boards are called upon to make credibility determinations. We rarely see one as stark as this. And where they say, we think he's a liar and this is made up, et cetera, how should we address that? And how is it that the board was so emphatic in this conclusion? Well, I think I can answer that. I've stated in my brief the reasons they had, in part because they had credibility issues with the claimant. If you recall, the record provided they asked Mr. Williamson's wife why her husband would, during vacation, go socialize with a victim's family or go on TV with respect to it or go over the dam in terms of his driving route when the symptoms of PTSD would call for just the opposite. And his wife testified, I don't know, why don't you ask him? And that's what the board did, is ask him. And they didn't believe his responses. They felt that his credibility was lacking in that regard. And I could give you each one of those instances where, for example, the issue of whether he knew the PTSD criteria. He indicated that he did not. I would challenge the appellate court panel to look at the pen inventory that's part of the record. And if the court really can conclude that one cannot derive what the symptoms of PTSD from that pen inventory, I would be extraordinarily surprised. It is a multiple-choice test that has various symptoms in that at the end of the test, it says if you scored this number of points, you have PTSD. Now, Mr. Baker, I'm sorry, Mr. Williamson had that test beforehand. And then he told this psychiatrist thereafter that he didn't know what the criteria for PTSD. He also told his psychiatrist or his medical treating personnel that he had been diagnosed by a psychiatrist with PTSD previously. That wasn't true. It said that he had PTSD acknowledged by his employer. That wasn't true. With regard to the question asked of his wife, why would he socialize with victims, et cetera, was he asked that question at the hearing? Yes. What was his response? His response was that he felt like he had to do that and that it bothered him while he did it. That was his response, that it upset him while he did it. Again, it didn't seem like a full and complete answer as to why you would do that. I'm not sure I understood his explanation of why he felt he needed to do that. Did he explain that further? No, he didn't. He just simply said he did it and it upset him. Therein lies the problem as to if there was a response that wasn't complete and full as to why you would do it. I think that is part of the whole calculus of determination as to whether a person is credible or not. We have the notion they were asked. These people, I'm sure, on the board are part of the police structure. They know, for example, that the employee assistance program, in terms of the posters for the employee assistance program and the dissemination of information of that to a person that is allegedly suffering from this, has that available. They asked him, well, why didn't you take advantage of the employee assistance program? He replied, I didn't know it was available. Well, he was in a command position. And the EAP, or the Employee Assistance Program, was posted throughout the city of Springfield Police Department. And the other aspect of it is that he never sought any treatment over 16 years of employment. Now, that seems unusual in terms of you having this gradual onset of symptomatology. Now, it just seems strange, and it seems strange to the board, I'm sure, that all of a sudden we have this floor abundance of symptomatology right when he wants to apply for a disability pension. That seemed a little bit incredible to the board as well. We note that in terms of the notion of the alcoholism, is that Dr. Finkenbein indicated that his alcoholism was in remission. So that whatever, and there's no question, I think, I think it's inarguable that alcoholism had at least some influence with regard to what his problems on the job were, and that that was in remission. So it would be expected that his job performance would be better once he got it in remission. But he didn't return to work after he went into remission on alcoholism. Dr. Finkenbein indicated also that his PTSD was being treated. And if he was able to work when his PTSD was not being treated, it seemed extremely logical that if it was being treated, that he would be able to work, since he worked when it was not treated. So I think that's one of the facts that the board drew upon also. But again, we go back to the notion of what the standard of review is, and I think the best rendition of that was in Hahn. Because the Hahn case indicated that it's not sufficient that there are conflicts in testimony. Perhaps there were here, but that's for the board to have ferreted out, to be able to look at the witness that was testifying, particularly the claimant, and view his demeanor, weigh the inconsistency and consistencies of his testimony, and make it a hard determination as to whether he was credible or not. And that's what they did. And I don't believe that there is any way that a reviewing court can look at that and say, well, the opposite conclusion is absolutely clear and convincingly evident. And again, there must be some other new standard review that would have to be interposed in order to avoid that particular conclusion by the board. The Hahn case also indicated that just because someone can draw a reasonable different conclusion isn't grounds for overturning a decision. And there could be instances where I or the circuit court or the appellate court could say, well, for this particular instance or that, we could draw a different reasonable conclusion. That's not the test. The test is it has to be from a manifest evidence standpoint that it's clearly evident that an opposite conclusion has to be drawn. That's a daunting standard of review here. And I don't think in any way, shape, or form that that standard has been overcome by the claimant. The Hahn case also said, and it's important, that the weight of the evidence, now that goes to the notion of what Mr. Baker is talking about, this selectivity. And again, if you're talking about the entire record, the entire record is before the court. I don't think it needs to have been placed in the briefs. The record is there, but as I say, there's no indication that the board didn't look at the entire record and that there's no indication that they didn't give sufficient weight to evidence that was proffered. Again, in the Hahn case said that the credibility of the witnesses is within the province, the sole province of the board. Now, again, I don't know what Mr. Baker is suggesting as to a new standard of review, but if we apply the standard of review, I respectfully don't see how this case can be overturned. Now, the Hahn case also concluded when it was discussing the standard of review that there need be only some competent evidence in the record to support its findings. That is why I painstakingly went through their 18-page decision and indicated in the record where they had that evidence. They didn't create the evidence. They didn't imagine it. They drew conclusions, no doubt, but those conclusions were clearly from the evidence that are, as I say, detailed in pages 7 to 21 of my brief. And I would ask the court if it has doubt as to whether those citations are correct to merely look at the record to see that they are. If any are not, it was simply inadvertent because I think that they are accurate. So I would respectfully ask the court to uphold the decision of the circuit court in finding that the Springfield Police Pension Board decision should be upheld. Thank you very much. Any rebuttal, Mr. Baker? Several points. Mr. O'Hara is suggesting that we are asking the court to carve out a new standard of review in pension disability cases. That's clearly not what we're doing. In fact, we made a painstaking effort to present to the court a number of cases of other reviewing courts who had considered disability pensions and had overturned them under the contrary to the manifest way to the evidence standard. We're asking this court to do no more than what's been done not only twice before but on numerous instances. For example, Mr. O'Hara spent three minutes of his discussion talking about the Hahn case and what the Hahn case's discussion was of the standard of review. What he omits is that in the Hahn case, there were four physicians that said the plaintiff was disabled. There were four physicians that said he was not. The court overturned the board's non-disability finding because it felt that the three physicians who concluded he was disabled or the four physicians that concluded he was disabled had examined him closer to the time he filed his application. They went further than what we're asking this court to do. Is there also a case where you were dealing with physical symptoms or physical injury as opposed to a reported circumstance like this one? I want to be sure that I give the court a correct answer. The answer is I'm not sure. I think it was a mental health case, but I don't want to go out on a limb. But there are a series of cases in which the courts have overturned board findings of non-disability in mental health cases even where a physician has offered an opinion supporting the board's decision. So we're not asking the court to bulldoze into a new area of the law here. The second thing is Mr. O'Hara is accurate in his brief. He attempted to cite references from the record to support many of the propositions. In our opening brief and in our reply brief, we focused on those and we pointed out what the board said and what the reference in the record was that was said, but also it pointed out what was not said that undermined it. So the board basically skewed some information without taking a look at the record in its entirety. The third point is, and I think Mr. O'Hara was not present during the hearing, but he indicated that Mr. Williamson really didn't have much of an explanation for why he continued to see the victim's family. He offered a pretty detailed explanation of that, and specifically with reference to the Drescher family. And what he said was that during the close working on homicide case, he developed relationships with the family. That was helpful to him in getting into the mind of the victim and putting together the pieces to help solve the crime. And he developed a very close relationship with the Drescher family. They were having trouble well after the trial in coping with what had happened. He liked them. He had a sense of feeling that he wanted to do what he could to support them. But there came a point in time where he basically sent them an email saying, I can't do this anymore. It's just too hard on me. So it was not a flippant remark. As what Mr. O'Hara said, it was fairly detailed. And he had further contact after sending that email. Isn't that correct? They contacted him. Right. I said he had further contact with him. Yes, but he didn't initiate it. The court has no further questions. I don't see any. Thank you. We'll be in recess until the next matter.